SHONG XIONG,                                        Civ. No. 09-2530 (DSD/AJB)

        Plaintiff,

v.                                                  **REPORT AND RECOMMENDATION**

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

_____

## INTRODUCTION

      Plaintiff Shong Xiong disputes the unfavorable decision of the Commissioner of Social

Security, denying her application for supplemental security income ("SSI").  The matter is

before this Court, United States Magistrate Judge Arthur J. Boylan, for a report and

recommendation to the District Court on the parties' cross-motions for summary judgment.  See

28 U.S.C. § 636(b)(1) and Local Rule 72.1.  Plaintiff is represented by Laura Melnick, Esq.

Defendant is represented by Lonnie F. Bryan, Assistant United States Attorney.  This Court has

jurisdiction under 42 U.S.C. § 405(g).  Based on the reasoning set forth below, this Court

recommends that Plaintiff's motion for summary judgment [Docket No. 8] be granted, and

Defendant's motion for summary judgment [Docket No. 11] be denied.

## PROCEDURAL HISTORY

      Plaintiff filed an application for supplemental security income on May 22, 2007.  (Tr.

60-67.)[1]  She alleges disability from depression, chronic pain, and hand numbness.  (Tr. 72.)  Her

application was denied initially and upon reconsideration.  (Tr. 24, 26, 44-47, 49-50.)  Plaintiff

timely requested a hearing before an administrative law judge, and the hearing was held on

September 5, 2008, before Administrative Law Judge David B. Washington ("ALJ").  (Tr. 481-

96.)  The ALJ issued an unfavorable decision on May 7, 2009.  (Tr. 10-23.)  On July 22, 2009,

the Appeals Council denied Plaintiff's request for review of the ALJ's decision, making the

ALJ's decision the final decision of the Commissioner.  (Tr. 6-9.)  See 20 C.F.R. § 416.1481.

On September 16, 2009, Plaintiff sought review from this Court.  The parties thereafter filed

cross-motions for summary judgment.

## PLAINTIFF'S BACKGROUND AND MEDICAL HISTORY

Plaintiff was born on January 1, 1962, and was 45-years-old on the date she filed the

application for supplemental security income.  (Tr. 21.)  Plaintiff was born in Laos, lived in a

refugee camp in Thailand for approximately 25 years, and came to the United States in 2004.

(Tr. 128, 188, 483.)  Plaintiff does not speak English, and she has no past relevant work.  (Tr. 21-

22.)  Plaintiff is married and has ten children, eight of whom lived with her at the time of the

hearing.  (Tr. 127, 484.)

### Plaintiff's Treatment for Physical Impairments

Plaintiff had a consultation with Dr. Mark Schumacher at Schumacher Chiropractic

Clinic on September 8, 2006.  (Tr. 303-04.)  Plaintiff was three months pregnant and complained

of diffuse global back pain.  (Tr. 304.)

---

[1]      The Court will cite the Administrative Record in this matter, Docket No. 7, as
"Tr."

A week later, Plaintiff saw Nurse Practitioner Michele Rehm-Johnson for chronic pain in her lower back, neck and trapezius muscles. (Tr. 186.) Plaintiff reported that the pain was worse with sitting and relieved by massage. (Id.) She had this pain for ten years, and this was her first time to seek treatment for it. (Id.) Nurse Johnson prescribed only Tylenol because Plaintiff was pregnant, and referred Plaintiff to Dr. Hasti for prenatal care. (Tr. 186.)

On October 6, 2006, Plaintiff saw Dr. Susan Hasti at North End Health Center and complained of tingling in her hands and pain in her wrists. (Tr. 185.) Examination was negative with the exception of recurrence of symptoms with severe flexion of the wrist. (Id.) Dr. Hasti diagnosed tendinitis and recommended using wrist splints at night. (Id.)

Plaintiff attended physical therapy for neck, back and foot pain at Primary Care and Rehabilitation beginning on October 12, 2006. (Tr. 305-10.) She had physical therapy from October 2006 through November 30, 2006 and from April 30, 2007 through June 2007. (Tr. 304-10.) In January 2008, she had several appointments for foot pain. (Tr. 305.)

Plaintiff gave birth at Regions Hospital on March 13, 2007. (Tr. 137.) She was discharged four days later. (Tr. 139.)

On July 10, 2007, Plaintiff saw Dr. Hasti at Open Cities Health Center for abdominal pain, previously diagnosed as a hernia. (Tr. 177-78.) Dr. Hasti told Plaintiff her only options were to strengthen the abdominal and lower back muscles, or look into having surgery. (Tr. 177-78.)

Approximately one year later, Plaintiff saw Dr. Hasti for continued abdominal and lower back pain. (Tr. 317, 319.) Dr. Hasti recommended a course of physical therapy for Plaintiff to strengthen her abdominal wall. (Tr. 317.) This had been an ongoing problem for Plaintiff since

her C-section, but Plaintiff did not want to have surgery.  (Id.)

Plaintiff saw Physical Therapist Scott Wagner on September 25, 2008, with complaints of constant low back pain for many years.  (Tr. 416.)  Plaintiff was not taking any medications for pain.  (Id.)  Plaintiff then returned to Dr. Hasti in October, and noted some improvement from physical therapy.  (Tr. 413.)  On examination, Dr. Hasti noted that Plaintiff was obese and had a palpable diathesis of the abdomen, muscle tenderness and tautness of the back.  (Id.)  Dr. Hasti prescribed Flexeril, and also noted Plaintiff's husband was considering giving his consent for surgery.  (Id.)

On December 10, 2008,  Mr. Wagner summarized Plaintiff's physical therapy treatment. (Tr. 412.)  Plaintiff had twelve sessions of ultra sound, soft tissue mobilization, stretching and strengthening exercises for her lower back.  (Id.)  Plaintiff reported that there was minimal progress in decreasing pain.  (Id.)  Mr. Wagner gave Plaintiff a home exercise program to be performed once a day.  (Id.)

Plaintiff saw Dr. Hasti on December 17, 2008, for neck pain.  (Tr. 410.)  Plaintiff reported that it hurt to turn her head or do household chores.  (Id.)  On examination, Plaintiff had "pretty good" range of motion of the neck, but it caused pain.  (Id.)  Dr. Hasti prescribed Tylenol with codeine, for one day only.  (Id.)

**Plaintiff's Treatment for Mental Impairments**

Psychological Evaluations

Plaintiff began seeing Dr. Roger Johnson at St. Anthony Mental Health Clinic on September 15, 2006.  (Tr. 282.)  Plaintiff reported symptoms of depression, insomnia, low energy, loss of interest, anhedonia, poor appetite, constant anxiety, irritability, decreased

concentration and memory, low self-worth, feeling helpless and hopeless, suicidal thoughts with no plan, and chronic pain. (Id.) Dr. Johnson prescribed Fluoxetine and Trazadone. (Id.)

Then, Plaintiff, using an interpreter, underwent an interactive psychiatric diagnostic interview with a licensed psychologist, Nathaniel Stewart, on November 14, 2006. (Tr. 239.) Plaintiff related that her depressive symptoms included suicidal thoughts, daily sadness, feelings of guilt, worthlessness, and self-dislike. (Tr. 239.) Plaintiff also complained of pain and nightmares. (Id.) Her nightmares were about seeing dead people, falling into water, and about her child who died. (Id.) On mental status examination, Plaintiff was alert and oriented with depressed mood, and thought content preoccupied with external stressors. (Tr. 241.) Plaintiff was noted to be on the following medications: Budeprion, Trazadone, Fluoxetine, Vanamide, Nabumetone, and Acetaminophen. (Tr. 241-42.) Mr. Stewart diagnosed major depressive disorder, severe; rule out dysthymic disorder; rule out anxiety disorder NOS; and he assessed a GAF score of 45.[2] (Tr. 240.)

Plaintiff was referred to Dr. Mark Schuler for a psychological evaluation on January 26, 2007. (Tr. 127-36.) In describing her problems to Dr. Schuler, Plaintiff said she was considering applying for Social Security disability benefits, because she feared she could not find a job that would pay enough for her to support her family. (Tr. 127.) She also said she could not work because her feet hurt, she can not stand for very long, and her arms tingle and

---

[2]     "[T]he Global Assessment of Functioning Scale [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning.'" *Hudson ex rel Jones v. Barnhart*, 345 F.3d 661, 662 n.2 (8th Cir. 2003) (quoting Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. Text Revision 2000) ("DSM-IV-TR")). A GAF score of 41-50 indicates serious symptoms and any serious impairment in social, occupational, or school functioning. DSM-IV-TR 32.

feel numb.  (Id.)

Plaintiff developed chronic pain as a child because she had to do a lot of hard farming work.  (Tr. 127, 189.)  Her pain increases with bending or sitting or standing too long.  (Tr. 127.)  Plaintiff's father died when she was approximately fifteen years old, and Plaintiff and her mother then moved to Thailand, where she lived in a refugee camp for approximately thirty years.  (Tr. 128.)  She was married in Thailand, and moved to the United States in September 2004.  (Id.)  Plaintiff has ten children between the ages of 2 and 21.  (Id.)  She had no formal education in Laos or Thailand.  (Tr. 127.)  She took some ESL classes in the United States.  (Id.)  She worries about not being accepted because she does not speak English.  (Id.)

Plaintiff reported that she began treatment for depression in September 2006, when a tax problem caused additional stress in her life.  (Tr. 128.)  She is also depressed from the death of one of her children while she was living in Thailand.  (Id.)

Plaintiff described her activities of daily living.  (Tr. 129.)  At that time, she lived with her husband and nine of her children.  (Id.)  She bathed every two nights.  (Id.)  She did some cooking but was absent-minded and burned the food.  (Id.)  Her children did some minor food preparation.  (Id.)  Her husband's niece helped the children learn to cook.  (Id.)  Plaintiff swept the floor and grocery shopped once a week.  (Id.)  She was learning to use a phone.  (Id.)  She did not drive.  (Id.)

At the time of the evaluation, Plaintiff was going to school from 9:00 a.m. to 1:00 p.m. (Tr. 129.)  When her children returned from daycare, she and her husband watched them.  (Id.)  She took walks when the weather was nice.  (Id.)  Her relatives visited her once a week, and her husband's niece visited two or three times a month.  (Id.)  Plaintiff was not attending church.

(Id.)  She went to parties at relatives' homes once a month.  (Id.)

According to the interpreter, Plaintiff did not always seem to pay attention to the questions.  (Tr. 130.)  She tended to talk faster than average.  (Id.)  Plaintiff said when she is really upset, she thinks about harming herself, but she wouldn't actually do it.  (Id.)  She appeared preoccupied.  (Id.)  Her mood appeared anxious and mildly depressed.  (Id.)  She was fairly well oriented and her performance on an attention task was good.  (Id.)  Dr. Schuler noted that it was her immediate response to say she did not know how to do something, even though her answer suggested that she knew what to do.  (Tr. 131.)

Dr. Schuler performed a nonverbal neurobehavioral cognitive examination but cautioned about interpreting the test scores due to cultural and educational differences.  (Id.)  Plaintiff scored very low in nonverbal abstract reasoning, but Dr. Schuler said the score likely underestimated her abilities due to cultural disparities.  (Id.)  Plaintiff scored at least low average in attentional abilities, with her true ability likely to be average.  (Tr. 132.)  Based on her manual dexterity testing, Dr. Schuler opined Plaintiff would be able to perform simple tasks where she is required to handle small objects.  (Id.)  On a learning and memory test, Plaintiff evidenced a good ability to attend to and retrieve information over time.  (Tr. 132-33.)

Dr. Schuler diagnosed pain disorder associated with psychological factors and a general medical condition; post traumatic stress disorder, delayed onset; rule out somatization disorder; dysthymic disorder; and he assessed a GAF score of 60.  (Tr. 134-35.)  Dr. Schuler opined that if Plaintiff's language barrier could be addressed, she would be able to perform an entry level assembly line job involving small object manipulation.  (Tr. 135.)

Plaintiff underwent a consultative psychological evaluation with Dr. Robert Barron on

August 1, 2007.  (Tr. 187-90.)  Plaintiff reported she was applying for disability based on long

term back and leg pain caused by carrying heavy loads and prolonged standing when she was in

Laos.  (Tr. 188.)  Plaintiff estimated she could stand for five minutes, walk one block, sit for ten

minutes, and lift and carry five pounds.  (Id.)  She also reported numbness in her arms for the

past four or five years.  (Id.)  She was right-handed, and could eat, comb her hair, and carry a

gallon of milk with her right hand.  (Id.)

Plaintiff reported that she was depressed for a long time since her parents died, and she

lived in poverty her whole life.  (Id.)  She was also depressed about her physical pain,

nightmares, and worrying.  (Id.)

Plaintiff described her daily activities as getting up at 8:00 a.m. and bathing and changing

clothes every two days.  (Tr. 189.)  She cooked three times a week.  (Id.)  If her husband was out,

she fed and changed her baby and helped the other children.  (Id.)  She went shopping with her

husband and children twice a month.  (Id.)  In her free time, she watched television and listened

to Hmong radio broadcasts.  (Id.)  She did not sew or garden.  (Id.)  She went to a soccer

tournament and the Hmong New Year's celebration.  (Id.)  She did not attend social gatherings

but did attend church.  (Id.)

Dr. Barron diagnosed major depressive disorder, single episode; post traumatic stress

disorder, chronic; and a provisional diagnosis of pain disorder associated with both

psychological factors and a general medical condition.  (Id.)  Dr. Barron opined that based on

Plaintiff's ability to comprehend and respond to questions during the interview, it appeared she

would be able to communicate, comprehend, and retain simple instructions in entry-level

employment.  (Id.)  However, based on her social and emotional functioning, subjective physical

symptoms, and restriction of activities of daily living, he opined it was doubtful she could withstand work-related stresses, perform routine, repetitive activities with reasonable persistence and pace, or meet production requirements in entry-level employment.  (Tr. 190.)

On August 16, 2007, state agency consultant Dr. Sharon Fredricksen completed a Psychiatric Review Technique form and Mental Residual Functional Capacity form regarding Plaintiff at the request of the Social Security Administration.  (Tr. 191-204, 208-211.)  Dr. Fredricksen opined that Plaintiff did not meet the paragraph B criteria of Listing 12.04 because she had mild restriction in activities of daily living, and moderate difficulties in maintaining social functioning and maintaining concentration, persistence or pace.  (Tr. 201.)

On December 24, 2007, Mr. Stewart noted that Plaintiff had ongoing and multiple stressors that diminished her motivation, energy, and overall happiness.  (Tr. 217.)  A month later, Plaintiff completed an anxiety questionnaire, and indicated that she had severe symptoms of numbness and tingling, wobbliness in the legs, unable to relax, fear of the worst happening, terrified, nervous, fear of losing control, fear of dying, and scared.  (Tr. 353.)  She had moderate symptoms of heart pounding or racing, unsteady, hands trembling, shaky, difficulty breathing, and face flushed.  (Id.)  Plaintiff reported that she was sleeping only three to four hours a night, and that her children administer her medications.  (Tr. 352.)  Plaintiff also completed the Beck Depression Inventory-II and scored 45.  (Tr. 354-65.)

When Plaintiff saw Mr. Stewart on April 30, 2008, she took the TONI-3, a test of nonverbal intelligence and ranked in the first percentile.  (Tr. 480.)  On May 22, 2008, Plaintiff rated her depression as five on a scale of one to five.  (Tr. 343.)  Plaintiff said she found it extremely difficult to understand money, financing and paying bills in America.  (Id.)  She

indicated the family was in a lot of debt.  (Id.)

Mr. Stewart completed an Intake Note regarding Plaintiff on August 28, 2008.  (Tr. 472.) Plaintiff reported long term depression, with treatment beginning in September 2006 with Psychiatrist Roger Johnson.  (Id.)  Plaintiff also reported severe to extreme lower back, neck, shoulder and bilateral leg pain, for which she said she was prescribed pain medication.  (Id.) Plaintiff also reported having nightmares.  (Id.)  Mr. Stewart diagnosed major depressive disorder, recurrent, severe; anxiety disorder NOS; and dysthymic disorder late onset.  (Id.)  He assessed Plaintiff's highest GAF score in the past year was 45.  (Tr. 473.)

On mental status examination, Plaintiff was fully oriented and appeared alert.  (Tr. 473.) Her speech was logical and coherent.  (Id.)  Her recent and remote memory were mildly impaired.  (Id.)  Her thought content was characterized by preoccupation with external stressors. (Id.)  Her attitude was open and cooperative.  (Id.)  Her judgment was fair.  (Id.)  Her attention and concentration were "characterized by the ability to attend and maintain focus."  (Tr. 473.) Stewart's treatment goals were as follows: develop physical exercise program to alleviate tension; diminish irritability; identify and correct cognitions which initiate/exacerbate anxiety; identify and correct irrational cognitions which lead to depression; improve ability to identify and express feelings to others; improve ability to think and concentrate; and improve ability to sleep more than seven hours nightly.  (Tr. 475.)

Mr. Stewart also completed a Mental Impairment Questionnaire regarding Plaintiff that day.  (Tr. 367–72.)  He assessed Plaintiff with a highest GAF score of 45 in the past year.  (Tr. 367.)  He indicated that Plaintiff's symptoms were poor memory, sleep disturbance, mood disturbance, emotional lability, feelings of guilt or worthlessness, difficulty thinking or

concentrating, suicidal ideation, motor tension, decreased energy, generalized persistent anxiety, and apprehensive expectation.  (Id.)  Mr. Stewart noted the following clinical findings, including results from mental status examinations, to support his opinion:

> An alert 46 year old Hmong woman who appears stated age.  She was oriented to time, place, person and situation.  Affect was constricted, mood depressed and anxious.  She was appropriately dressed.  Estimated range of intellectual functioning is intellection deficient using TONI-3.  Recent and remote memory mildly impaired.  She was easily distracted and seem (sic) preoccupied with external stimuli/stressors.  She denied hallucinations of any kind and there were none noted or observed.  She was not psychotic.  She was reflective.  Judgment fair, comprehension and rationale poor.  Concentration was poor and she was often inattentive and needed redirection.  She responded favorably to redirecting.

(Tr. 368.)  He also noted Plaintiff's psychiatric condition exacerbated her pain.  (Id.)

Mr. Stewart opined that Plaintiff's impairments would cause her to miss more than three days of work per month, she had poor to no abilities to do most of the mental work required for unskilled work, and her mental impairments markedly impaired her activities of daily living, caused marked difficulties in maintaining concentration, persistence or pace, and caused marked episodes of decompensation, each of extended duration.  (Tr. 369-71.)

On September 2, 2008, Mr. Stewart again administered the Beck Anxiety and Depression Inventories and the Routine Daily Activities questionnaire.  (Tr. 465-71.)  Plaintiff's score on the inventories suggested moderate to severe symptoms of depression and anxiety.  (Tr. 465.)  At the end of the month, Mr. Stewart administered the questionnaire and inventories again.  (Tr. 458-63.)  He noted that Plaintiff's scores were clinically significant and severe on both.  (Tr. 458.)  Plaintiff was feeling anxious, pessimistic, and very self-critical.  (Id.)

On September 7, 2008, Dr. Johnson completed a Mental Impairment Questionnaire regarding Plaintiff. (Tr. 376-81.) He indicated that Plaintiff's symptoms were poor memory, appetite disturbance with weight change, mood disturbance, anhedonia, psychomotor agitation, feelings of guilt or worthlessness, difficulty thinking or concentrating, motor tension, apprehensive expectation, suicidal ideation, emotional withdrawal or isolation, decreased energy, pathological dependence or passivity, and generalized persistent anxiety. (Tr. 376.) He assessed Plaintiff's highest GAF score in the past year as 43. (Id.)

Dr. Johnson opined that Plaintiff suffered daily fatigue, suffered a condition that would make her sensitive to stress, had a history of being overwhelmed with even basic life activities, and her low stress tolerance would regularly affect her ability to get to work on time and maintain attention for two-hour periods. (Tr. 377.) He cited the following clinical findings in support of his opinion: anxiety with apprehensive expectation, low energy, and poor concentration. (Id.) Dr. Johnson also indicated that Plaintiff's depression made her physical discomfort worse. (Tr. 378.) He opined her impairments would cause her to miss more than three days of work per month, and she had a fair ability to do ten mental tasks required for unskilled work, and poor to no ability to do six mental activities required for unskilled work. (Tr. 378-79.) Dr. Johnson opined that Plaintiff had marked restrictions in activities of daily living and difficulties in maintaining social functioning, and extreme difficulties in maintaining concentration, persistence or pace. (Tr. 380.) He explained his opinions by stating Plaintiff had no confidence, poor concentration, and constant anxiety. (Id.)

In counseling on January 26, 2009, Plaintiff reported that she felt tired, lethargic, and sometimes fainted. (Tr. 442.) Plaintiff was stressed financially and with family matters. (Id.)

Mr. Stewart administered the Beck Inventories again, and Plaintiff scored in the severe range in anxiety, and in the extreme range in depression.  (Tr. 442-45.)

On March 14, 2009, Mr. Stewart noted Plaintiff was depressed, sad daily, and seemed sick often.  (Tr. 435.)  She rated her depression as severe, and she appeared sad.  (Id.)  However, Plaintiff rated her anxiety symptoms on the Beck Anxiety Inventory as mild to none at all.  (Tr. 436.)

Mr. Stewart administered the WAIS-III intelligence test to Plaintiff on May 7, 2009.  (Tr. 422.)  Plaintiff's IQ score was assessed at 59.  (Id.)

<u>Dr. Roger Johnson's treatment notes</u>

Plaintiff's psychiatrist, Dr. Roger Johnson, usually wrote one short handwritten paragraph about his session with Plaintiff in his treatment notes.  (<u>See</u> <u>e.g.</u> Tr. 281.)  On October 19, 2006, Plaintiff reported a big improvement in her symptoms after starting medications.  (Tr. 281.)  In November, she was worrying, so Dr. Johnson prescribed Wellbutrin.  (Id.)  On December 18, 2006, Dr. Johnson said Plaintiff was doing well and was mostly euthymic.  (Tr. 280.)

Then, on April 20, 2007, Plaintiff was having insomnia, so Dr. Johnson increased her Trazadone.  (Tr. 280.)  Plaintiff applied for SSI on May 22, 2007.  From June through September 6, 2007, Plaintiff  was euthymic.  (Tr. 279.)  In October, she complained of depression and pain.  (Tr. 278.)  The next month, she reported depression and insomnia.  (Id.)  In December 2007, she was a little better but still had insomnia and depression, and her medications were increased. (Tr. 277.)

In January 2008, Plaintiff was not sleeping well and had depressive symptoms.  (Id.)  Six

months later, she ran out of medications and was back into major depressive disorder. (Tr. 374.)

In July, she improved but still met the DSM-IV definition for major depressive disorder, and Dr.

Johnson prescribed Cymbalta. (Id.) On September 8, 2008, Dr. Johnson opined that Plaintiff

was still in a major depressive disorder on many medications. (Tr. 406.) He added a

prescription for Lexapro. (Id.) The next month, Plaintiff had improved some but still had

insomnia and depression. (Id.) Dr. Johnson noted that Plaintiff had no side effects from the

massive doses of medication she was taking. (Id.) He prescribed Depakote. (Id.) On December

17, 2008, Dr. Johnson noted Plaintiff's many symptoms of depression and anxiety, and stated it

was clear her many medications were not working. (Tr. 405.) Nonetheless, Plaintiff wanted to

keep her medications. (Id.) Plaintiff seemed somewhat better psychiatrically the next week, but

complained of severe upper back pain. (Id.)

On January 14, 2009, Plaintiff reported her mood had improved, with mild off and on

symptoms. (Id.) Plaintiff continued to have mild symptoms the next month, and stayed on all of

her medications. (Id.) On April 15, 2009, Dr. Johnson noted he would phase out all medications

except Trazadone and Seroquel and start an MAO inhibitor. (Tr. 404.)

Psychologist Nathaniel Stewart's treatment notes

Plaintiff saw Psychologist Nathaniel Stewart for psychotherapy, and P&K Interpreting

provided services. Mr. Stewart usually used a form entitled "Psychotherapy Progress Notes" to

record information about Plaintiff's counseling in a women's group she attended approximately

bi-monthly. (See e.g. Tr. 246.) The form has several parts. The first part has boxes to check

under the heading, "Presenting Complaint." The boxes are thought disorder, vocational

problems, physical abuse, depression, alcohol abuse, anxiety, marital problems, drug abuse,

other, family problems, criminal charges, health problems, and financial problems.  The second

part  is "Severity of Presenting Problem" with options of mild, moderate, severe and disabling.

The third part has a list of 36 symptoms to check.  The fourth part is distress level, with options

of mild, moderate or severe.  The fifth part is "Affecting Factors of Responsiveness," with

options of none, alcohol, drugs, medications and pain.  The sixth part is "During Interview

Primary Facial Expression," with options of normal & responsive, sad, neutral, hostile, worried

or other.  The seventh part is "Symptoms of Depression as Reported by Client."  This is followed

by the symbol (√√√), which presumably indicates a rating on a scale of one to three.[3]  There are

also check the box options following the symbol, including none, poor appetite, loss of interests,

motor retardation, sleep disturbance, fatigue, weight loss, loss of interest in sex, guilt and other.

The eighth part of the form is "Observed Signs of Anxiety" also followed by the rating scale

(√√√), and the following check the box options: none, physical indications, apprehensive

manner, problems in attention and other.  The ninth part of the form is "Somatization Concerns"

followed by (√√√), and check the box options of none, cardiac, pulmonary, gastrointestinal,

reproductive, cancer, dermatologic, pain and other.  The last three parts of the form are 1)

aggressiveness, with options of none, angry without violent behavior, and appears capable of

sudden violence; 2) level of functioning, with options of poor, fair, average, good and excellent;

and 3) treatment goal progress, with options of no progress, some improvement, and great

improvement.  Mr. Stewart rarely completed every section of the form.

---

[3]       In a later version of the form, the symbol (√√√) was replaced with (Severity level
1, 2, 3).  See e.g. Tr. 220.

The following is a summary[4] of how Mr. Stewart completed the form on the approximately fifty-three counseling sessions where the form was used.  (See Tr. 215-72, 339-366, 422-480).  When he completed that part of the form, Mr. Stewart always checked depression as a presenting problem; and he checked financial problem all but once.  He also checked "family problem" twice; "other-cultural issues, including language barriers" eighteen times; anxiety, thirty-one times; and health problems, forty-four times.  When Mr. Stewart completed the symptoms box, he always checked sad/depressed mood; and he checked muscle tension twenty-one times; anxiety, twenty-six times; sleep disturbance, thirty-seven times; fatigue, ten times; appetite disturbance, once; inability to focus, twice; concentration problems, eleven times; restlessness, three times; irritability, two times; decrease in energy, two times; increase in energy, once; memory issues, once; racing thoughts, once; nightmares, once; and flashbacks, twice.

When Mr. Stewart completed the distress level part of the form, he checked mild twice, moderate, twenty-six times, and severe, eleven times.  When he completed the facial expression part of the form, he checked sad approximately twenty-seven times; neutral four times; worried twice, and normal & responsive five times.  When he completed the section on depression level as reported by the client, Mr. Stewart checked 2/3 approximately twenty-two times; 3/3 fifteen times, and more than 3/3 was written in on two occasions.  Mr. Stewart indicated that he rated Plaintiff's observed signs of anxiety at a level of 2/3 approximately twenty-one times, 2 ½ out of 3 once; and 3/3 thirteen times.  As to Plaintiff's progress on treatment goals, Mr. Stewart checked some improvement approximately thirty-six times, and none three times.  On the

---

[4] All numbers are close approximations.

occasions when Mr. Stewart completed the aggressiveness part of the form, he checked angry without violent behavior. When he completed the "factors affecting responsiveness" part of the form, he checked the box for pain. When he completed the severity level of somatization, he indicated 2/3 for pain.

**TESTIMONY AT THE ADMINISTRATIVE HEARING**

Plaintiff testified to the following, with the services of an interpreter, at the hearing before the ALJ. Plaintiff was 46-years-old and came to the United States in 2004. (Tr. 483-84.) She had ten children, eight of whom still lived with her. (Tr. 484.) Plaintiff's daily activities included getting up at 7:00 or 8:00, cleaning herself, and watching cartoons with the children. (Tr. 485.) Plaintiff's oldest daughters did the cooking, because Plaintiff had numbness and tingling in her arms when she raised them. (<u>Id.</u>) The kids did their own laundry. (<u>Id.</u>) Plaintiff did not go to church. (<u>Id.</u>) Plaintiff's sister lived in Minneapolis and visited because Plaintiff did not know how to drive. (Tr. 486.) Sometimes walking hurt Plaintiff's feet, so she alternated walking and sitting. (<u>Id.</u>) She would have to rest to walk to the corner of her block and back to her house. (<u>Id.</u>) She could stand for ten to fifteen minutes. (Tr. 487.) She had to stretch after sitting, due to back pain. (<u>Id.</u>) Bending was difficult. (<u>Id.</u>) When asked if there was any work Plaintiff thought she could do, she said she picked up after the kids once in awhile. (<u>Id.</u>)

Plaintiff testified that her oldest daughter comes over four or five times a week to help clean the house, shower the younger children, put them to bed, and help with the laundry. (Tr. 488.) Plaintiff took ESL classes, but guessed that it was about two years ago that she quit. (<u>Id.</u>) She stated that her 20-year-old son paid the bills. (<u>Id.</u>) She had two children not yet in school, and their older brothers and sisters helped feed them before school. (<u>Id.</u>)

Plaintiff got her driver's permit after seven or eight tries at the written test, but it expired without her getting a license, because she never had a car to practice driving. (Tr. 489.) Plaintiff's children take her where she needs to go using her daughter's car. (Id.) Interpreters take Plaintiff to doctor appointments. (Id.) Plaintiff doesn't do anything for fun; she spends time with her kids and watches television. (Id.) Plaintiff's hand numbness and weakness had improved, but her shoulders, back and legs still hurt. (Tr. 490.) Plaintiff was only able to sleep two or three hours a night. (Id.) She had trouble napping during the day. (Id.) Plaintiff said she did not go to the Hmong soccer tournament in July. (Id.) Plaintiff bathed once a day, and her daughter helped by turning on the water and washing her back. (Id.)

A medical expert, Dr. Andrew Steiner, testified at the hearing. (Tr. 491-92.) He noted Plaintiff had an extensive ventral hernia, but no objective findings regarding her other pain complaints. (Id.) He noted that her wrist pain and tingling was attributed to tendinitis. (Tr. 491.) Dr. Steiner recommended a light exertional level based on Plaintiff's hernia as the most limiting physical factor. (Id.) He did not suggest any other restrictions. (Tr. 492.) He agreed that psychiatric conditions could exacerbate pain. (Id.)

A vocational expert, J. Harren, also testified at the administrative hearing. (Tr. 492-95.) The ALJ asked the vocational expert whether a younger person who did not speak English, and with the following limitations, could perform any work: light exertional level; simple, routine, repetitive work; and no detailed or complex work activity. (Tr. 492.) The VE testified that such a person could perform jobs at an SVP level of one, which would accommodate non-English speaking, including representative occupations of light assembler, unskilled packager, and folder. (Tr. 492-93.) Ms. Harren stated that her testimony was consistent with the Dictionary of

Occupational Titles. (Tr. 494.)

Ms. Harren testified that if, in addition to the first hypothetical, the person could not maintain regular attendance or punctuality, no work would be available. (Id.) Also, if the first hypothetical question included inability to perform at a consistent pace, it would not allow for substantial work activity. (Tr. 494-95.) In unskilled work, the VE testified that only two absences were permitted a month. (Tr. 495.) There would also be no work available for a person who had no meaningful ability to handle work stress. (Id.)

**THE ALJ'S DECISION**

On May 7, 2009, the ALJ issued his decision denying Plaintiff's application for supplemental security income. (Tr. 10-23.) The ALJ followed the five-step sequential evaluation set forth in the agency's regulations. See 20 C.F.R. § 416.920(a). The Eighth Circuit Court of Appeals has summarized these steps as follows: (1) whether the claimant is currently engaged in "substantial gainful activity"; (2) whether the claimant suffers from a severe impairment that "significantly limits the claimant's physical or mental ability to perform basic work activities"; (3) whether the claimant's impairment "meets or medically equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education and work experience)"; (4) whether the claimant has the residual functional capacity ("RFC") to perform his or her relevant past work; and (5) if the ALJ finds that the claimant is unable to perform his or her past relevant work, then the burden is on the ALJ "to prove that there are other jobs in the national economy that the claimant can perform." Fines v. Apfel, 149 F.3d 893, 894-95 (8th Cir. 1998).

At the first step of the evaluation process, the ALJ determined that the claimant has not

19

engaged in substantial gainful activity since May 22, 2007, the application date. (Tr. 15.) At the second step of the process, the ALJ found that Plaintiff had severe impairments of depressive disorder, posttraumatic stress disorder, and ventral hernia. (Id.)

At the third step of the evaluation, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 16-7.) Specifically, the ALJ found Plaintiff to have mild restriction in activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in concentration, persistence or pace. (Id.) The ALJ also found there was no evidence of psychiatric hospitalization, structured living arrangement, increase in treatment other than slight medication adjustments, and no evidence she would decompensate if additional mental demands were required. (Tr. 17.)

At the fourth step of the evaluation process, the ALJ determined that Plaintiff had the residual functional capacity to perform light work, not requiring comprehension of English; and simple, routine, repetitive work. (Id.) The ALJ found that Plaintiff had no past relevant work. (Tr. 21.) Based on the vocational expert's testimony, the ALJ found that Plaintiff could perform other work that exists in substantial numbers in the national economy including assembler, folder and packager. (Tr. 22.) Thus, the ALJ found that Plaintiff was not under a disability, as defined in the Social Security act. (Tr. 23.)

**DISCUSSION**

### Standard of Review

Review by this Court is limited to a determination of whether a decision of the ALJ is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); Murphy v.

<u>Sullivan</u>, 953 F.2d 383, 384 (8th Cir. 1992). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)). "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings." <u>Gavin v. Heckler</u>, 811 F.2d 1195, 1199 (8th Cir. 1987). "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis." <u>Id.</u>

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact. <u>Woolf v. Shalala</u>, 3 F.3d 1210, 1213 (8th Cir. 1993). The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion. <u>Mitchell v. Shalala</u>, 25 F.3d 712, 714 (8th Cir. 1994); <u>see</u> <u>also</u> <u>Woolf</u>, 3 F.3d at 1213 (the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding.) Instead, the Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contrary." <u>Gavin</u>, 811 F.2d at 1199.

The claimant bears the burden of proving his or her entitlement to disability benefits. <u>See</u> 20 C.F.R. § 404.1512(a); <u>Thomas v. Sullivan</u>, 928 F.2d 255, 260 (8th Cir. 1991). Once the claimant has demonstrated he or she can not perform prior work due to a disability, the burden of proof shifts to the Commissioner to show that the claimant can engage in some other substantial gainful activity. <u>Martonik v. Heckler</u>, 773 F.2d 236, 239 (8th Cir. 1985).

**<u>Analysis</u>**

Plaintiff raises four main arguments: 1) the ALJ made erroneous findings of fact; 2) the ALJ improperly discounted treating and examining source opinions; 3) the ALJ erred in

determining that Plaintiff did not meet or equal Listing 12.04; 4) and the ALJ improperly

discounted the VE's testimony in response to Plaintiff's counsel's hypothetical questions.  The

Court will address these arguments in the order of the five-step disability evaluation process.

<u>Listing 12.04 and findings of fact</u>

The regulations provide that certain impairments are considered "severe enough to

prevent an individual from doing any gainful activity, regardless of his or her age, education, or

work experience."  20 C.F.R. § 416.925(a).  Such conditions are described in the Listing of

Impairments, 20 C.F.R. § 404, Subpart P, Appendix 1.  Depression is analyzed under Listing

12.04, affective disorders.  <u>See</u> <u>Randolph v. Barnhart</u>, 386 F.3d 835, 840 (8th Cir. 2004)

(analyzing major depressive disorder under Listing 12.04).  Once the ALJ determines that a

claimant's depression results in at least four of the nine listed symptoms in 12.04(A), the ALJ

must then determine whether the impairment results in at least two of the four listed functional

limitations of an affective disorder.  <u>Pyland v. Apfel</u>, 149 F.3d 873, 877 (8th Cir. 1998).  The

parties do not dispute whether Plaintiff met the diagnostic part of Listing 12.04.  The dispute is

over the ALJ's evaluation of the severity part of the Listing.

Specifically, Plaintiff must prove that her depression resulted in at least two of the

following:  marked restriction of activities of daily living; marked difficulties in maintaining

social functioning; marked difficulties in maintaining concentration, persistence or pace; or

repeated episodes of decompensation, each of extended duration.  20 C.F.R. § 404, Subpart P,

Appendix 1, § 12.04(B).

Plaintiff contends there is no evidence in the record supporting the ALJ's conclusion that

Plaintiff has only mild restrictions in activities of daily living and social functioning, and only moderate difficulties in maintaining concentration, persistence or pace. Further, Plaintiff contends there is no evidence supporting the ALJ's finding regarding Plaintiff's "active daily routine," that Plaintiff was independent in self-care and was the primary care provider for two of her youngest children while her older children were in school. Plaintiff contends she has marked limitations in activities of daily living because she relies on her family for help with childcare and most household chores. Plaintiff correctly cites Section 12.00(C)(1) of Appendix 1 in asserting the quality of activities of daily living are judged by the extent the person is capable of initiating and participating in activities independent of supervision or direction.

The ALJ did not cite any medical opinion in support of his finding under Listing 12.04(B) that Plaintiff had only mild restrictions in daily activities and social functioning and moderate restrictions in concentration persistence or pace. However, the state agency consultant, Dr. Sharon Fredricksen, reviewed Plaintiff's medical records on August 16, 2007, and concluded that Plaintiff had mild restriction in activities of daily living and moderate difficulties in social functioning and concentration, persistence or pace. Her opinion would support a finding of not meeting Listing 12.04, but it conflicts with the opinions of Dr. Johnson and Mr. Stewart, both of whom found marked limitations in Plaintiff's daily activities and concentration, persistence or pace. Dr. Fredricksen's opinion did not take into account two years of mental health treatment by Dr. Johnson and Mr. Stewart that occurred after her review of Plaintiff's file.

Other than watching television and listening to the radio, the record indicates Plaintiff has help from her family for all household chores and in caring for her eight children who live with her. Plaintiff's children administer her medication to her, her daughter reminds her to wash

her hands after using the bathroom, and she relies on her family for transportation.

Plaintiff correctly states that the ALJ only assumed Plaintiff was the primary care giver for her two youngest children while the older children were in school because Plaintiff's husband is disabled. In order to support a finding that caring for her youngest children indicated only mild restrictions in Plaintiff's activities of daily living, the ALJ should have inquired further into what amount of care was required, and how Plaintiff's and her husband's disabilities affected how much care each provided. The ALJ's assumption that Plaintiff is the primary care giver for two young children is not substantial evidence supporting his finding that Plaintiff has only mild restrictions in activities of daily living when the evidence in the record suggests Plaintiff relied on others significantly for assistance with even basic life activities.

The ALJ found that Plaintiff has only moderate limitations in concentration, persistence or pace and cited evidence that Plaintiff was easily redirected and interacted appropriately in psychotherapy. The regulations provide:

> We must exercise great care in reaching conclusions about your ability or inability to complete tasks under the stresses of employment during a normal workday or work week based on a time-limited mental status examination or psychological testing by a clinician, or based on your ability to complete tasks in other settings that are less demanding, highly structured, or more supportive. We must assess your ability to complete tasks by evaluating all the evidence, with an emphasis on how independently, appropriately, and effectively you are able to complete tasks on a sustained basis.

20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(C)(3).

Plaintiff's psychotherapy sessions, typically an hour long, were conducted twice a month. Plaintiff's easy redirection when she lost concentration in this setting does not say much about her ability to maintain concentration, persistence or pace in full-time competitive employment.

The ALJ also relied on Dr. Schuler's opinion that Plaintiff's low intelligence test results likely underestimated her abilities due to her lack of formal education and cultural disparities. The ALJ further noted that another test indicated Plaintiff had average to low average abilities to learn new information, retain information, and sustain concentration. As the regulations state, the ALJ must exercise great care in reaching conclusions about the ability to work based on a time-limited mental status examination or psychological testing by a clinician. While the ALJ may be correct that Plaintiff has the intellectual ability to perform some work, this ignores Plaintiff's fluctuating emotional symptoms that may have a great effect on her work performance. Plaintiff's treating sources opined that she had marked limitations in concentration, persistence or pace. Mr. Stewart's treatment notes indicated that Plaintiff had many symptoms, often moderate, but fairly often severe, that would interfere with her ability to concentrate and maintain persistence or pace, including depression, anxiety, sleep disturbance, fatigue, and somatization of pain.

The Court concludes the ALJ failed to heed the cautions in the regulations about assessing the level of independence of Plaintiff's daily activities and Plaintiff's ability to complete tasks under stress of employment, relying instead on her performance of a task in a supportive, less demanding setting. The Court agrees with Plaintiff that the ALJ should have obtained additional evidence from a medical expert in psychology or psychiatry rather than a medical expert in physical medicine to address whether the record as a whole supported a finding of the severity of mental impairments necessary to meet or equal Listing 12.04. Therefore, at a minimum, remand is necessary for further development of the record. However, the Court will address Plaintiff's additional arguments.

<u>Residual functional capacity: weighing the medical source opinions</u>

Plaintiff contends the ALJ erred by not granting controlling weight to Dr. Johnson's and Mr. Stewart's opinions because they are consistent with Mr. Stewart's treatment notes, the GAF scores, Dr. Johnson's records of fluctuating symptoms and prescriptions for many medications, and because their opinions are consistent with each other. Plaintiff also contends it was error for the ALJ to place little weight on Dr. Barron's opinion that it was doubtful Plaintiff would be capable of withstanding work stress or performing routine work activities with reasonable persistence or pace, because his opinion was consistent with the treating source opinions. Plaintiff argues it was error for the ALJ to reject her treating source opinions on the basis that they relied on her subjective complaints, and because they failed to take into account Plaintiff's "choices and cultural differences." Plaintiff also contends Dr. Schuler's opinion is entitled to less weight because it was based on her condition several months before she applied for disability.

Defendant argues substantial evidence supports the ALJ's decision to grant the greatest weight to Dr. Schuler's opinion for the following reasons: Dr. Johnson's treatment notes documented little if any of Plaintiff's actual functioning; Plaintiff was euthymic for a period of time, and showed improvement at other times; Plaintiff told Dr. Schuler she was seeking disability because she could not earn enough money to support her family; Dr. Schuler's opinion was based on objective evidence and was inconsistent with Dr. Johnson's, Dr. Barron's, and Mr. Stewart's opinions; Mr. Stewart listed cultural differences and language barriers as one of Plaintiff's presenting problems; Mr. Stewart's notes are inconsistent with his opinion because he routinely checked "moderate" as the severity of Plaintiff's presenting problems; Mr. Stewart

relied more on Plaintiff's subjective complaints; Plaintiff routinely made some improvement toward her therapy goals; and Plaintiff's GAF scores only reflected a moment in time.

A treating physician's opinion is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and not inconsistent with other substantial evidence in the record. 20 C.F.R. § 416.927(d)(2). If the ALJ does not grant controlling weight to a treating physician's opinion, the ALJ determines how much weight to grant medical opinions by applying the following factors:

> (1) whether the source has examined the claimant; (2) the length, nature and extent of the treatment relationship and the frequency of examination; (3) the extent to which the relevant evidence, "particularly medical signs and laboratory findings," supports the opinion; (4) the extent to which the opinion is consistent with the record as a whole; (5) whether the opinion is related to the source's area of specialty; and (6) other factors "which tend to support or contradict the opinion." 20 C.F.R. §§ 404.1527(d), 416.927(d), *see also* Wagner v. Astrue, 499 F.3d 842, 848 (8th Cir. 2007).]

Owen v. Astrue, 551 F.3d 792, 800 (8th Cir. 2008). The regulations reflect the need for longitudinal evidence in evaluating mental impairments because a person with a chronic mental impairment is likely to have fluctuations in levels of functioning over time. Andler v. Chater, 100 F.3d 1389, 1393 (8th Cir. 1996); 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(D)(2).

The ALJ's assertion about Plaintiff's GAF scores reflecting only a moment in time is not supported by the record. On September 7, 2008, Dr. Johnson assessed Plaintiff with a GAF score of 43 as the highest score in the past year; and on August 28, 2008, Mr. Stewart assessed Plaintiff with a GAF score of 45 as the highest score in the past year. Dr. Johnson and Mr. Stewart had initially assessed Plaintiff with GAF scores in the 40s when they began seeing her in 2006. Only Dr. Schuler's assessment of Plaintiff's GAF score as 60 stands out as inconsistent

with the other GAF scores in the record, and it was based on Dr. Schuler's one time evaluation of Plaintiff in January 2007. The evidence in the record does not support the ALJ's decision to discount Dr. Johnson's and Mr. Stewart's GAF score assessments as only reflecting a moment in time. A record of all but one GAF score under 50 supports Dr. Johnson's and Mr. Stewart's opinions of the severity of Plaintiff's mental impairments. See Halverson v. Astrue, 600 F.3d 922, 931 (8th Cir. 2010) (citing Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009)

The ALJ also discounted Dr. Johnson's opinion because his treatment notes reflect little, if any, of Plaintiff's actual functioning. Dr. Johnson's treatment notes, while sparse, reflected fluctuations in Plaintiff's symptoms of depression and anxiety. The ALJ was correct that Dr. Johnson noted Plaintiff's medications worked well when she first started taking them, and that Dr. Johnson characterized Plaintiff as "euthymic" over a period of several months in mid-year 2007. However, by noting only Plaintiff's periods of improvement, the ALJ does not appear to have fully considered Plaintiff's fluctuating symptoms over time. For example, at the end of 2008, Dr. Johnson noted that Plaintiff had many symptoms of depression and anxiety, and her many medications were not working. See Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001) (fact that plaintiff was prescribed increasing doses of antidepressants indicated depression was not in remission). As the regulations make clear, it is important for the ALJ to consider that the severity of functional limitations caused by chronic mental impairments may fluctuate over time.

While Plaintiff was seeing Dr. Johnson for medication management, Plaintiff was also seeing a licensed psychologist, Mr. Stewart, for psychotherapy. Mr. Stewart's treatment notes, although often recorded on a "check the box" type form, contain information that was consistent

with Dr. Johnson's opinion that Plaintiff's lack of confidence in herself, poor concentration, and constant anxiety caused severe functional limitations. See Tr. 380.

The ALJ also erred by discounting Dr. Johnson's and Mr. Stewart's opinions because they were based on Plaintiff's subjective complaints, instead favoring Dr. Schuler's conclusions based on objective testing on one occasion. It is common knowledge, and is reflected in Mr. Stewart's psychotherapy treatment notes, that illnesses like depression and anxiety are evaluated in large part by the patient's report of symptoms over time. The Social Security regulations explain that medical evidence used in evaluating mental impairments includes evidence that reflects the "medical source's considerations *of information from you* and other concerned persons who are aware of your activities of daily living; social functioning; concentration, persistence or pace; or episodes of decompensation." 20 C.F.R. § 404, Subpart P, Appendix 1, §12.00(D)(1)(a) (*emphasis added*).

The regulations also address the importance of considering the longitudinal evidence of mental impairments, instead of focusing on one time test results, such as the manual dexterity and learning and memory tests Dr. Schuler used to conclude Plaintiff would be able to perform an entry level assembly line job involving small object manipulation. The Court also notes that Mr. Stewart did not rely solely on Plaintiff's subjective complaints. The standard form he used to record psychotherapy progress contained information regarding his clinical observations, such as the client's facial expression, observed signs of anxiety, and somatization concerns, which are objective evidence of Plaintiff's mental impairments.

The ALJ also discounted Mr. Stewart's opinion because his treatment notes indicated that one of Plaintiff's presenting complaints was cultural issues and language barriers, which Dr.

Schuler believed accounted for Plaintiff's low scores, even on a nonverbal test of intelligence. There is no doubt from the record that Plaintiff's inability to read, write, speak or understand English and her experience of not having a formal education, and spending most of her adult life in a refugee camp in Thailand were cultural issues that affected her functional abilities. However, that does not preclude the possibility that she also had severe functional limitations from depression and anxiety. Plaintiff attributed her chronic depression to many of her life experiences, including chronic poverty, hard physical labor, and the loss of a child.

The ALJ discounted Mr. Stewart's opinion of the severity of Plaintiff's functional limitations because Stewart routinely checked "moderate" as the level of Plaintiff's presenting complaints, and routinely noted Plaintiff made some progress towards her therapy goals. By looking at the record in this narrow manner, the ALJ ignores the overall picture that the record presents. It is true that Mr. Stewart usually checked that Plaintiff's presenting problems were moderate. However, even when he indicated her presenting problems were moderate, he also rated her distress level and/or her observed signs of anxiety and reported symptoms of depression as severe. Mr. Stewart often checked boxes on his standard form, which indicated Plaintiff's somatic complaints of pain affected her responsiveness to therapy. Even with the fluctuations of her symptoms between moderate and severe, Mr. Stewart always assessed Plaintiff's level of functioning as only "fair." The overall picture presented is of a person with chronic mental illness whose psychological impairments exacerbate pain and cause her to feel more distress than one might otherwise expect. The evidence as a whole does not support the ALJ's inference that Plaintiff's mental impairments overall caused only moderate functional limitations or that there was any significant improvement over time.

Consultative Examiner Dr. Barron's opinion, that it was doubtful Plaintiff could withstand work-related stresses, perform routine, repetitive activities with reasonable persistence or pace, or meet production requirements in entry-level employment, was also consistent with both Mr. Stewart's and Dr. Johnson's opinions of Plaintiff's functional limitations. The Court concludes the ALJ relied too heavily on Dr. Schuler's one-time evaluation of Plaintiff's abilities to do mental tasks, which was done before Plaintiff applied for SSI.. Thus, for the many reasons discussed above, the ALJ erred by not granting Mr. Stewart's opinion, Plaintiff's treating psychologist, controlling weight. See Turpin v. Bowen, 813 F.2d 165, 170-71 (8th Cir. 1987) (ALJ must give substantial weight to treating physician's opinion in the evaluation process unless it is unsupported by the evidence or merely conclusory).

### The VE's testimony in response to a hypothetical question

Because Mr. Stewart's opinion was entitled to controlling weight, the ALJ should have included all of the functional limitations described by Mr. Stewart in the hypothetical question to the VE. See Pickney v. Chater, 96 F.3d 294, 297 (8th Cir. 1996) (holding hypothetical question to vocational expert must capture the concrete consequences of all the claimant's impairments). When Plaintiff's counsel added functional limitations to the hypothetical question posed to the VE that were consistent with Mr. Stewart's opinion, the VE testified that there would be no work such a person could perform. See Tr. 494-95. Therefore, Plaintiff established that she is entitled to SSI. See Goff v. Barnhart, 421 F.3d 785, 794 (8th Cir. 2005) ("A vocational expert's testimony 'based on a properly phrased hypothetical question constitutes substantial evidence.'") (quoting Roe v. Chater, 92 F.3d 672, 675 (8th Cir. 1996)). The Court recommends reversing the Commissioner's decision and remanding for an award of benefits.

**RECOMMENDATION**

**IT IS HEREBY RECOMMENDED THAT:**

1. Plaintiff's Motion for Summary Judgment be granted  [Docket No. 8], and the case be remanded pursuant to sentence four of 42 U.S.C. 405(g) for reversal and an award of benefits;

2. Defendant's Motion for Summary Judgment [Docket No. 11] be denied;

3. Judgment be entered accordingly.


Dated: November 22, 2010   ___s/ Arthur J. Boylan_____
            ARTHUR J. BOYLAN
            United States Chief Magistrate Judge

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.  This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals. Written objections must be filed with the Court before December 6, 2010.